IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

ROOSEVELT GUY, II,

                              Plaintiff,                        Case No. 3:04 CV 7544

        -vs-

                                                                <u>MEMORANDUM   OPINION</u>

CENTRAL LOCATING SERVICE, LTD.,

                              Defendant.

KATZ, J.

      This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. No. 19).

Plaintiff has responded (Doc. No. 23), and Defendant has replied (Doc. No. 34). This Court has

jurisdiction under 28 U.S.C. §§ 1331 and 1367. For the reasons that follow, Defendant's motion is

granted in part and denied in part.

<u>BACKGROUND</u>

      Plaintiff Roosevelt Guy, II worked for Defendant Central Locating Service ("CLS") as a utility

locator from May, 2003, to December, 2003. CLS responds to "Call Before You Dig" reports phoned

into the Ohio Utility Protection Service. Plaintiff's job as a utility locator required him each morning to

upload, via computer, tickets instructing him to travel to different sites in Huron County, Ohio, where he

would use charts and underground detection equipment to discern the location of underground utility lines

and mark the locations with paint and flags. CLS gave Plaintiff a company truck, a laptop computer, and

utility-locating equipment. When CLS laid off Plaintiff due to a seasonal downturn in business, Plaintiff's

job performance evaluation gave him the lowest score of all CLS locators. CLS did not rehire Plaintiff

when its business picked up in the spring of 2004. During his employment with CLS, Plaintiff was its only

African-American employee working out of the Toledo office.

Plaintiff has sued CLS under 42 U.S.C. § 1981 and Ohio Revised Code § 4112.02, claiming

that it discriminated against him on the basis of his race in several ways. First, Plaintiff claims CLS treated

him differently from white employees with respect to his training, his raise, the truck and equipment it

issued him, and the job assistance that management made available to him. Second, Plaintiff claims CLS

discriminated against him with respect to his layoff and CLS's failure to rehire him. Third, Plaintiff claims

CLS created and tolerated a racially hostile working environment. Plaintiff additionally brings a claim of

intentional infliction of emotional distress. Because the factual allegations underlying Plaintiff's claims are

extensive, the Court will set them forth as necessary throughout the opinion.

### DISCUSSION

*A. Summary Judgment Standard*

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

The moving party bears the initial responsibility of "informing the district court of the basis for its motion,

and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of

material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d

265 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting

2

one or more essential elements of the non-movant's claim. *Id.* at 323-25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2541, 91 L. Ed. 2d 202 (1986) (*quoting* FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact."

3

*Williams*, 154 F. Supp. 2d at 1071.  The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999).  Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

*B. Discrimination as to Terms and Conditions of Employment*

Plaintiff claims that CLS discriminated against him on the basis of race in the terms and conditions of his employment, including disparate treatment in training, in the raise he received, in the truck and equipment CLS issued him, and in the help available to him from his supervisor. While Plaintiff has shown a genuine issue of material fact exists with regard to his claim of disparate treatment as to his training and raise, Defendant is entitled to summary judgment on Plaintiff's other disparate treatment claims.

Both 42 U.S.C. § 1981 and Ohio Revised Code § 4112.02 prohibit racial discrimination with respect to the terms and conditions of an employment relationship. 42 U.S.C. § 1981(b); Ohio Rev. Code § 4112.02(A). "A plaintiff who alleges discrimination in conditions of employment must demonstrate, in order to make out a prima facie case, only that he is a member of a class entitled to . . . protection . . . and that he is accorded treatment different from that accorded persons otherwise similarly situated who are not members of the class." *Potter v. Goodwill Indus. of Cleveland*, 518 F.2d 864, 865 (6th Cir. 1975); *see also Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 n.5 (6th Cir. 2000) ("The elements of prima facie case as well as the allocations of the burden of proof are the same for employment claims stemming from Title VII and § 1981."); *Williams v. Ford Motor Co.*, 187 F.3d

4

533, 538 (6th Cir. 1999) ("The Ohio courts have held that the evidentiary standards and burdens of proof applicable to a claimed violation of Title VII of the Civil Rights Act of 1964 are likewise applicable in determining whether a violation of Ohio Rev. Code § 4112 has occurred. Thus, the federal case law governing Title VII actions is generally applicable to cases involving alleged violations of Chapter 4112.").

### 1. Training

The training CLS provided its new hires consisted of: (1) a week or two during which individual trainees rode along with a single, experienced utility locator as the locator performed the day's tasks; (2) a week-long classroom component culminating in a certification exam; and (3) field training in which a group of trainees performed utility locates with a field instructor. (Doc. No. 25, Morgan Depo., p. 5-6). Plaintiff does not claim that he was discriminated against in regard to the classroom component of his training. However, he claims that white employees received better instruction during the one-on-one ride-alongs and better training opportunities during the group field training.

The evidence is insufficient for a jury to find that Plaintiff's ride-along experience differed from those of white trainees. Plaintiff was unable to provide any information about what went on during the other employees' one-on-one ride-alongs. (Doc. No. 28, 77-79). Moreover, his belief that white employees had experienced locators riding along with them while he was sent out to do the job on his own was based solely upon his own speculation after observing unknown persons riding in those employees' trucks. *Id*.

However, a jury could base a finding of discrimination on Plaintiff's own testimony about his group field training experience. Plaintiff testified under oath in his deposition that, during his field training

5

with instructor Mike Stein ("Stein"), Stein never let Plaintiff actually use the locating equipment Plaintiff was supposedly being trained to use, though the white trainees with whom Plaintiff trained actually used the equipment. (Doc. No. 28, p. 91, 94). The credibility of Plaintiff's statement, which directly conflicts with the testimony of Jacob Fox ("Fox") and Chad Morgan ("Morgan"), his fellow trainees, who both testified that Plaintiff used the equipment, is not for this Court to judge. A jury could credit Plaintiff's testimony and disbelieve Messrs. Fox and Morgan. This is especially so coupled with Plaintiff's testimony that trainer Stein made racially disparaging comments during the training sessions, including, in Plaintiff's words, that "they want to take over everything. A white man can't get a job. Men can't have anything. Just seeing them down in Florida, it's like a zoo. They're everywhere," (Doc. No. 28, p. 133) and, in response to Plaintiff's request to help Jacob Fox perform a locate, "stay in the backseat and . . . fall asleep or something, that's all you guys do." (Doc. No. 26, Fox Depo., p. 9). Plaintiff has shown there is an issue of fact as to whether he received field training inferior to that provided to white employees.

### 2. Raise

According to his District Manager, Andrew Costell ("Costell"), Plaintiff received a $.60 raise in November of 2003. (Doc. No. 24, Costell Depo., p. 48); (Doc. No. 19, ex. U). He believes he should have received a $1.00 raise. (Doc. No. 28, p. 96). While Plaintiff has failed to present evidence about the raises received by any employees other than himself, he has established that CLS determined his raise by evaluating his work performance, which included reports of damaged utility lines resulting from incorrect or incomplete locates. *See* (Doc. No. 24, Costell Depo., pp. 48-49). If the jury finds that CLS discriminated against Plaintiff in his field training, the jury could reasonably determine that racial discrimination affected Plaintiff's work performance, and therefore tainted CLS's determination of the

6

amount of Plaintiff's raise. *Cf. Simpson v. Diversitech Gen., Inc.*, 945 F.2d 156, 159-160 (6th Cir. 1991) (finding "impermissible racial motivations" for the plaintiff's termination where the plaintiff's discipline record was tainted by an incident in which a supervisor initiated discipline due to the plaintiff's race); *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1040-41 (2d Cir. 1993) (finding that evidence that the employer denied the employee an opportunity to improve her job performance because of the employee's membership in protected class could support the employee's claim that her termination for poor performance was discriminatory); *Vaughn v. Edel*, 819 F.2d 517, 521-23 (5th Cir. 1990) (finding that the defendant's race-based failure to counsel the employee about her work deficits meant that race played a part in her performance-based termination); *Griffin v. City of Omaha*, 785 F.2d 620, 627-28 (8th Cir. 1985) (holding that where black, female police recruits received inferior training based on their race, an issue of fact existed as to their performance-based termination from the recruit program).[1] Therefore, summary judgment for Defendant is not appropriate as to Plaintiff's raise.

### 3. Truck, Equipment, and Assistance

Plaintiff asserts in his response to Defendant's motion for summary judgment that:

> Plaintiff . . . was not given a back-up piece of equipment as he was told in training. Other employees had them. Plaintiff received a truck that was not in good running condition. According to Guy, Mr. Burdine took his truck and gave it to Adam Bain and Guy received a worse one. Plaintiff's truck was also never serviced. Plaintiff also testified that when he worked out in Huron County, Ohio, and that when he and Jake Fox, his co-worker who was assigned to Erie County, were swamped with tickets, Josh Burdine would go out and help Mr. Fox but not Plaintiff.

---

[1]

The Court discusses these cases in more detail below, in Section C, in relation to Plaintiff's claim of racial discrimination as to his layoff.

(Doc. No. 23, p. 2) (internal citations omitted). However, Plaintiff has not presented evidence from which a jury could conclude that CLS treated him differently from similarly-situated, white employees with respect to his truck or equipment, or with respect to his supervisor, Joshua Burdine's ("Burdine") availability to help Plaintiff on the job.

Plaintiff testified on deposition that when new employees were initially being assigned company trucks, supervisor Burdine initially told Plaintiff that he could have a certain truck, but that a longer-serving employee, Adam Bain ("Bain"), who had ben driving a "real bad, nasty truck" stepped in and claimed the truck that had initially been assigned to Plaintiff, and that Burdine gave Plaintiff Bain's old truck. (Doc. No. 28, pp. 45-46). Plaintiff also testified that, though he was told in training he would have a back-up piece of equipment, he was not issued one, and instead obtained one from an employee who was leaving CLS. *Id*. at 44. When Bain saw Plaintiff with the piece of equipment, Bain claimed it for himself. *Id*. at 45.

Plaintiff has presented no evidence showing that either incident involving Bain was racially motivated. In fact, the testimony of other employees belies such a conclusion. Plaintiff's co-worker Jacob Fox, who started working for CLS at the same time Plaintiff did, testified that "we never had good equipment. We never had good vehicles. I know for a fact that we both [i.e., Fox and Plaintiff] had very horrible vehicles." (Doc. No. 26, Fox Depo., p. 17). Regarding the company trucks, co-worker Chad Morgan testified that, "[i]t was slim pickings for everybody. I mean it was whatever they gave you." (Doc. No. 25, Morgan Depo., p. 14). Morgan elaborated, "[t]he new guys got the worst trucks, period. . . . [T]hey get a rotation of new trucks in every, say, approximately six months. And the guys who have been there longer and doing a good job or whatever get the new trucks and the other ones get

8

rotated down to us." *Id*. at 28-29. District Manager Costell testified that "[o]ur trucks had 80- to 140,000 miles on them. We had problems with every vehicle." (Doc. No. 24, Costell Depo, p. 23). Moreover, while Plaintiff testified that the "back-up" piece of equipment he obtained from another employee and that Bain then took from him was an "RD-4000," Costell testified that the two pieces of standard equipment for CLS locators were a "Metrotech 810" and a "Subsite." *Id*. While this testimony supports an inference that Bain acted on the basis of seniority and the generally poor nature of all of CLS's equipment, nothing supports Plaintiff's claim that he was treated differently from a white worker in regard to truck or equipment allocation.

Plaintiff also testified that other employees would have their trucks serviced at a commercial garage and would drive a CLS loaner while theirs was being worked on, but that four times Burdine told Plaintiff he did not have a loaner available or did not have the time to drop a truck off to Plaintiff so that Plaintiff could have his truck serviced. (Doc. No. 28, p. 47). However, Plaintiff's evidence falls short: Plaintiff has no evidence that he was similarly situated to workers who were given loaner trucks, i.e., that loaners were actually available when Plaintiff's requests were denied.

As to work assistance from Burdine, Plaintiff testified that:

I would work out in Huron County, and the closest guy to me was Jake Fox in Erie County. And we would get so swamped with tickets that, you know, it was just impossible to get them all done in one day by yourself. And Josh would come out and help Jake with his ticket load.

And I would call Josh and I would say, "Josh, you know, are you coming out here? I need some help. And he'd tell me no. No, I'm not coming out there. I would call Jake, and Jake would say, well, he just left from helping me. Why didn't he come help you? And I just couldn't figure it out.

*Id*. at 48. As with Plaintiff's claims that Burdine failed to provide a loaner truck, Plaintiff's rather unspecific testimony fails to show he was similarly situated to Fox in that Burdine was available to help him when he requested it. Therefore, Defendant is entitled to summary judgment on Plaintiff's claims of disparate treatment with regard to his truck and equipment, and job assistance from Burdine.

*C. Discrimination as to Layoff*

Section 1981 prohibits racial discrimination in the modification and termination of contracts. 42 U.S.C. § 1981(b). Claims of race-based employment discrimination brought under Section 1981 and premised on circumstantial evidence are analyzed under the same burden-shifting framework as are claims brought under Title VII of the Civil Rights Act of 1964. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 n.5 (6th Cir. 2000). That framework, first set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), requires a plaintiff to first establish a prima facie case of discrimination by showing that:

> 1) he is a member of a protected class; 2) he was qualified for the job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action; and 4) that he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class.

*Johnson*, 215 F.3d at 572-73. If the plaintiff meets this burden, the defendant must articulate a legitimate, non-discriminatory reason for its action. *Id*. at 573. In a so-called "mixed motivation" case, in which the adverse employment action was partly motivated by legitimate factors and partly motivated by the plaintiff's membership in a protected class, the plaintiff must then:

> [P]rove by the preponderance of the evidence either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another

"motivating factor" is the plaintiff's protected characteristic (mixed-motive alternative). The latter showing may be made with either "direct" or "circumstantial" evidence.

*Dunbar v. Pepsi-Cola Gen. Bottlers of Iowa, Inc.*, 285 F. Supp. 2d 1180, 1198 (N.D. Iowa 2003) (internal citations omitted); *see also Carey v. FedEx Ground Package Sys., Inc.*, 321 F. Supp. 2d. 902, 916 (S.D. Ohio 2004) (citing *Dunbar*).

Several courts have found that where an employee's record is tainted with incidents caused by racial discrimination, and the decision to take an adverse employment action is based on the employee's record, race is a motivating factor for the employment action. *See, e.g.*, *Simpson v. Diversitech Gen., Inc.*, 945 F.2d 156, 159-160 (6th Cir. 1991); *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1040-41 (2d Cir. 1993); *Vaughn v. Edel*, 819 F.2d 517, 521-23 (5th Cir. 1990); *Griffin v. City of Omaha*, 785 F.2d 620, 627-28 (8th Cir. 1985).

In *Simpson*, the evidence indicated that a supervisor had imposed discipline on the plaintiff because of the plaintiff's race. *Simpson*, 945 F.2d at 160. The discipline led to the plaintiff being placed under a "Last Chance Agreement" that the plaintiff then violated, resulting in his discharge. *Id*. The supervisor who disciplined the plaintiff was not involved in the decision to terminate him. *Id*. However, the Sixth Circuit found that but for the supervisor's racial discrimination, there would have been no last chance agreement, and concluded "that there were impermissible racial motivations for the termination . . . and its genesis was" the racial discrimination by the supervisor. *Id*.

In both *Cosgrove* and *Vaughn*, the plaintiffs were terminated for poor performance; however, in each case, because of the respective plaintiff's membership in a protected class, her employer had failed to provide counseling and criticism that might have helped improve her job performance. *Cosgrove*, 9

11

F.3d at 1037, 1040; *Vaughn*, 918 F.3d at 519-20. In each case, the terminations were based in part on

protected characteristics. *Cosgrove*, 9 F.3d at 1037, 1040; *Vaughn*, 918 F.3d at 521-23. Cosgrove's

employer deprived her of "the opportunity to have follow-up counseling and performance evaluations

described in the company's manual that was open to all other employees, after she had filed sex

discrimination charges with the EEOC," and the Second Circuit concluded that the "decision to terminate

Cosgrove's employment . . . was motivated, at least in part, by an illegitimate reason." *Cosgrove*, 9 F.3d

at 1040. Vaughn's department manager admitted he told her supervisors not to confront her about poor

work performance or counsel her on how to improve, for fear such criticism would prompt a race-

discrimination lawsuit. *Vaughn,* 918 F.2d at 519, 521. The Fifth Circuit found that the employer treated

Vaughn differently than other employees because she was black, agreed with her contention that "racial

discrimination was the reason she was in the position to be fired," and concluded that "although Vaughn's

race may not have directly motivated the . . . decision to fire her, race did play a part . . . in Vaughn's

employment relationship with Texaco . . . ." *Id*. at 522.

  The *Vaughn* court explained that where racial discrimination taints an employee's ability to

improve her work performance, the employee was entitled to an inference that her performance might

have been better had she been given an equal opportunity to improve:

> Had Texaco treated Vaughn in a color-blind manner from 1985 to 1987, Vaughn might
> have been fired by April 1987 for unsatisfactory work; on the other hand, she might have
> sufficiently improved her performance so as not to be one of the two "lowest ranked"
> employees, thereby avoiding termination in April 1987. Consequently, Texaco must bear
> the cost of its lost opportunity to determine whether Vaughn might have remained one of
> the two "lowest ranked" contract analysts had it not made decisions based on race. This
> circuit will not sterilize a seemingly objective decision to fire an employee when earlier
> discriminatory decisions have infected it.

*Id*. at 523; *see also Cosgrove*, 9 F.3d at 1040 (citing the quoted passage from *Vaughn* and noting that "it cannot be determined whether Sears would have discharged Cosgrove if she had received the manual-mandated follow-up counseling and further evaluation").

Finally, in *Griffin*, black, female police recruits who were terminated from the recruit class for failing firearms tests alleged that they had received inferior training compared to white recruits, in that instructors ignored them in class and did not criticize their techniques or provide instruction. *Griffin*, 785 F.2d at 623. The Eighth Circuit determined as to one recruit that the evidence was sufficient to merit consideration on remand as to whether the disparate treatment in training resulted in the recruit's failure to qualify. *Id*. at 627-28.

Here, Defendant claims it is entitled to summary judgment on Plaintiff's claim that he was laid off for racially discriminatory reasons because Plaintiff has failed to show that he was qualified for the position and was performing satisfactorily, and has failed to show that he was replaced by or treated less favorably than a non-class-member. Defendant claims it laid off Plaintiff because a seasonal downturn in its business required it to lay off its worst performers, and Plaintiff's composite evaluation was the lowest of all CLS locators, largely due to damages to utility lines caused by improper or incomplete locates, and that Plaintiff cannot show this reason is pretext. Defendant additionally claims that the "same-actor" defense applies. The Court finds that Plaintiff has made a showing sufficient to present his claim to a jury.

Defendant claims Plaintiff is unqualified and was not performing satisfactorily in that he had several incidents of damages due to improper locates and had been placed on a Behavior Modification Plan (BMP), was "apparently" using marijuana, and "routinely falsified his time sheets." (Doc. No. 19, p. 11). Plaintiff has presented evidence sufficient to create a genuine issue of fact as to whether he was

qualified and performing adequately. First, in light of the above-cited cases, Defendant cannot claim Plaintiff's poor performance renders him unqualified, where, as here, there is evidence that Defendant discriminated against Plaintiff by providing him inferior and inadequate training. After his classroom training, but before his field training, Plaintiff scored a 95.5 on his written locator exam, indicating he had the ability to do well. *See* (Doc. No. 19, ex. N). Moreover, Defendant gave Plaintiff a raise in November of 2003, (Doc. No. 19, ex. U), and considered him for rehire even at the time it laid him off. (Doc. No. 24, Costell Depo., p. 51). Under oath, Plaintiff repeatedly denied using marijuana, (Doc. No. 28, p. 189) and, in any event, there is no evidence CLS knew or had reason to suspect Plaintiff was using drugs while it employed him. Finally, Plaintiff testified that he filled his time sheets out to report forty hours worked as supervisor Costell instructed him, and that he in fact worked more than forty hours per week. (Doc. No. 29, p. 319).

Plaintiff has also presented evidence sufficient to create an issue of fact as to the fourth prima facie case requirement. While Defendant is correct that "[s]preading the former duties of a terminated employee among the remaining employees does not constitute replacement, *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992), based on *Simpson* and the similar cases cited above, Plaintiff has shown there is an issue of fact as to whether he was treated less favorably than CLS's white employees, who were not evaluated for layoffs on the basis of work performance potentially tainted by racially-biased training.

As in *Simpson, Cosgrove, Vaughn, and Griffin*, CLS's use of Plaintiff's work performance to determine whether he would be laid off, where that work performance was potentially tainted by race-based discrimination in training, creates an issue of fact as to whether race was a motivating factor in the

14

decision. If the jury determines Plaintiff did receive inferior training based on his race, CLS must bear the cost of the lost opportunity to determine how Plaintiff would have performed with the same training opportunities afforded white trainees. Along the same line, Defendant's reliance on the "same actor defense," under which a strong inference arises that there was no discrimination where the same person hires and fires an employee, *see Hartsel v. Keys*, 87 F.3d 795, 804 n.9, does not apply here, where Costell's evaluation of Plaintiff's work performance was potentially tainted by discrimination in Plaintiff's training. Summary judgment for defendant on Plaintiff's claim of racial discrimination as to his layoff is therefore inappropriate.

*D. Discrimination in Failure to Rehire*

CLS argues that Plaintiff was not eligible for rehire because he failed to promptly return his equipment when he was laid off. CLS claims it had to send someone to Plaintiff's house to retrieve his truck and that Plaintiff kept his laptop until CLS paid him for old tolls incurred traveling to and from Huron County. While Plaintiff testified that he returned the truck as soon as practicable, he testified that he could not remember when he returned the laptop. (Doc. No. 28, pp. 161-63, 166-67, 176-80). Plaintiff has therefore failed to show that Plaintiff's legitimate non-discriminatory reason for failing to rehire him – failure to return his laptop immediately upon his layoff – was pretextual, and summary judgment for Defendant is appropriate on that claim.

*E. Racial Harassment*

Section 1981 provides a cause of action for racial harassment in the workplace, as does Ohio Revised Code § 4112.02. 42 U.S.C. § 1981(b); *Jackson v. Quanex Corp.*, 191 F.3d 647, 657 (6th Cir. 1999); *Summerville v. Ross/Abbot Labs*, 1999 U.S. App. LEXIS 21009, at *14 (6th Cir. Aug.

10, 1999). The Court must evaluate Plaintiff's claims under the same standard as claims brought under

Title VII. *Jackson*, 191 F.3d at 658; *Summerville*, 1999 U.S. App. LEXIS 21009 at *14.

> To establish a prima facie case of racial harassment, Plaintiff must show that:
>
> 1. He was a member of a protected class;
> 2. He was subjected to unwelcomed racial . . . harassment;
> 3. The harassment was based on race . . . ;
> 4. The harassment had the effect of unreasonably interfering with [Plaintiff's] work performance by creating an intimidating, hostile, or offensive work environment; and
> 5. The existence of employer liability.

*Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999).

Title VII is violated only "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)) (internal citations omitted). In making this determination, the Court looks to the totality of the circumstances and considers such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Conduct that is not overtly racial may comprise part of a racially hostile environment if Plaintiff can show the conduct occurred because of his race. *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000). "Title VII does not prohibit all verbal or physical harassment in the workplace; it is

directed only at 'discrimination . . . because of . . . [race].'" *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998).

Plaintiff alleges a plethora of incidents he believes combined to create a racially hostile work environment. He testified that supervisor Burdine instructed him to enter a manhole so that he could see what conduit looked like, which Plaintiff did. (Doc. No. 28, p. 28-29). Plaintiff later learned that, due to gasses that can become trapped inside, it is dangerous to enter a manhole without taking safety precautions that Burdine failed to take. *Id*. at 31, 140-41. When Plaintiff subsequently complained about the incident to district manager Costell, Plaintiff testified that Costell merely laughed about it, and Burdine told Plaintiff not to be "so damn nosy." *Id*. at 31. Additionally, Plaintiff testified that co-worker Sean Matthews and Burdine threw cases of paint at Plaintiff while workers were passing the cases along in a "chain of people," getting "faster and faster," while unloading a truck. *Id*. at 48-49. Plaintiff also cited the tendency of Matthews to engage in "horseplay" with him and to call him "Rosie," short for his first name, Roosevelt. *Id*. at 205. Plaintiff stated that, once, Costell told Plaintiff his paycheck had not arrived, then, after Plaintiff had gone home, called Plaintiff and told him his check was at the office and that Costell had been playing a joke on him. *Id*. at 111-113. Plaintiff testified that Burdine criticized Plaintiff's work performance, and sent a co-worker Plaintiff had previously had an altercation with to check up on one of Plaintiff's locates. *Id*. at 119, 121-22. Finally, Plaintiff reported that Costell asked Plaintiff to sign discipline forms for several past occurrences all on one day, because the corporate office was unhappy with Plaintiff's performance and Costell needed to take action. *Id*. at 146.

Plaintiff has failed to present evidence showing that any of the preceding incidents occurred because of his race. Along the same line, while Plaintiff claims Burdine told him CLS would not hire any

17

more black people, Plaintiff's own testimony only shows that Burdine said that CLS was not going to hire anyone else, which Plaintiff took to mean African Americans. *Id.* at 136-37. Jacob Fox testified that he was also told that CLS was not hiring when he asked for an application for a friend. (Doc. No. 26, Fox Depo., p. 76).

Plaintiff additionally cites to the fact that he was not given a piece of back-up equipment as he had been told he would, the fact that his truck was swapped out for a less desirable truck, was not in good working condition and was not serviced, the fact that he received only a $.60 raise, and the fact that Burdine helped Jacob Fox but not Plaintiff. As discussed above in Section B, there is no evidence that any incident save Plaintiff's raise was imbued with racial discrimination, and Plaintiff has an independent cause of action relating to his raise.

The remaining incidents Plaintiff cites clearly are related to his race. First, Harris Mintz ("Mintz"), a supervisor, told Plaintiff that Mintz had "been with the Bloods and Crips" and would "have fun" with Plaintiff. (Doc. No. 28, pp. 198-201). Though Mintz spoke in response to Plaintiff's accusation that Mintz was a rapist, the jury could find that Mintz's comments were race-based. *Id*. Additionally, Plaintiff testified that: Burdine once called him "tar baby," *id*. at 106-07, 110; that someone at CLS said he was "from the 'hood," *id*. at 49; that trainer Stein made the racist comments discussed above in Section B; that Costell once had Costell's ex-wife ask Plaintiff whether black men engaged in oral sex, and Burdine once asked Plaintiff whether black men were well-endowed, *id*. at 115; that a co-worker named Brad once called him "Pooky the Crackhead," a character from a movie, *id*. at 116; and that someone at CLS called him "Strut" because that person said Plaintiff walked like he was dancing, *id*. at 118.

18

Though these incidents are clearly based on race and are certainly "distasteful and boorish," *see Clark v. United Parcel Serv.*, 400 F.3d 341, 351 (6th Cir. 2005), they amount to isolated occurrences of "teasing" or "offhand comments" that, under *Faragher*, are not actionable. The incidents were not physically threatening or humiliating, but were mere "offensive utterances." There is no evidence that they unreasonably interfered with Plaintiff's work performance. While Plaintiff testified that he was "picked on" every time he went into the CLS office, Plaintiff has not shown that the teasing was race-based. (Doc. No. 28, p. 49). Because there is insufficient evidence for the jury to conclude that the terms and conditions of Plaintiff's employment were altered by harassment that occurred because of Plaintiff's race, summary judgment for Defendant is appropriate on Plaintiff's hostile environment claim.

*F. Intentional Infliction of Emotional Distress*

To establish a claim of intentional infliction of emotional distress, Plaintiff must show that:

(1) defendant intended to cause emotional distress, or knew or should have known that actions taken would result in serious emotional distress; (2) defendant's conduct was extreme and outrageous; (3) defendant's actions proximately caused plaintiff's psychic injury; and (4) the mental anguish plaintiff suffered was serious.

*Hanly v. Riverside Methodist Hosp.*, 603 N.E.2d 1126, 1132 (Ohio Ct. App. 1991). For conduct to be found "extreme and outrageous":

It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

19

Restatement (Second) of Torts § 46 cmt. d (1965), *quoted with approval in Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers*, 453 N.E.2d 666, 671 (Ohio 1983). "Serious emotional distress describes emotional injury which is both severe and debilitating. Thus, serious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." *Paugh v. Hanks*, 451 N.E.2d 759, 765 (Ohio 1983).

In response to Defendant's motion for summary judgment, Plaintiff claims that "defendant's supervisor sought to subject Plaintiff to risk of serious harm or even death by forcing him into a manhole. Then, when Plaintiff complained, the matter was laughed off. This severe act, coupled with routine harassing remarks and a scheme of compounded disciplinary actions which Plaintiff claims was not based in fact and which were shown to Plaintiff all at once clearly bring this case out of the garden variety of employment disputes." (Doc. No. 23, pp. 14-15).

Laughing, "routine harassing remarks," and trumped-up disciplinary actions are neither "extreme and outrageous," nor "utterly intolerable in a civilized community" and therefore cannot form the basis of an intentional infliction of emotional distress claim. *Yeager*, 453 N.E.2d at 671 (holding that liability for intentional infliction of emotional distress "'clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'") (quoting Restatement (Second) of Torts § 46 cmt. d (1965)); *see also DeLoach v. Am. Red Cross*, 967 F. Supp. 265, 268-69 (N.D. Ohio 1997) (holding that conduct including racial harassment, poor work performance reviews, and termination was not extreme and outrageous and could not support plaintiff's intentional infliction claim); *Dunn v. Medina Gen. Hosp.*, 917 F. Supp. 1185, 1194-95 (N.D. Ohio 1996) (finding conduct including age-based

harassment, exclusion from office parties, increased work load, cursing by the plaintiff's supervisor, and the dumping of plaintiff's birthday cake in the trash can not to be extreme or outrageous).

The only incident cited by Plaintiff in support of his claim that a jury could find to be "extreme and outrageous" is the incident in which supervisor Burdine required Plaintiff to enter a manhole without proper safety precautions, subjecting him to physical danger. However, Plaintiff has failed to present evidence showing that any serious emotional distress he suffered was proximately caused by that incident. Plaintiff cites to his own deposition testimony, in which he states that his preexisting anxiety and panic attacks were under control "until [he] was being treated the way [he] was treated." (Doc. No. 28, p. 242). This vague statement is insufficient to link the anxiety and panic attacks to the manhole incident. While Plaintiff's discovery, after the fact from his co-worker Jacob Fox, that his trip down the manhole was potentially dangerous, led him to start keeping a journal of incidents that happened to him at work, *id*. at 32, he has provided no evidence showing that the manhole incident, specifically, caused him serious mental anguish with which a normal person would be unable to cope.

Finally, though Plaintiff claims he suffered from a preexisting fear of enclosed spaces and testified that this fear was a reason he initially did not want to enter the manhole, there is no testimony or other evidence showing that his claustrophobia (mistakenly dubbed "agoraphobia" in Plaintiff's deposition) was actually aggravated by the incident, or that Burdine knew of Plaintiff's fear when he told Plaintiff to climb down the manhole ladder. *See id*. at 246. Summary judgment in favor of Defendant on Plaintiff's intentional infliction of emotional distress claim is therefore appropriate.

## CONCLUSION

Based on the foregoing, Defendant's Motion for Summary Judgment (Doc. No. 19) is granted as to Plaintiff's claims of: disparate treatment in his truck, equipment, and job assistance; discrimination in failure to rehire; racially hostile environment; and intentional infliction of emotional distress. Defendant's Motion is denied as to Plaintiff's claims of: disparate treatment in training and raise; and discrimination in layoff.

IT IS SO ORDERED.

_s/ David A. Katz_____
DAVID A. KATZ
SENIOR U. S. DISTRICT JUDGE